**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Joseph H. Meltzer (*pro hac vice* forthcoming)
jmeltzer@ktmc.com
Melissa L. Yeates (*pro hac vice* forthcoming)
myeates@ktmc.com
Tyler S. Graden (*pro hac vice* forthcoming)
tgraden@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiff and the proposed Classes*
*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOANNE HARRIS and TERRY PAUL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 25-cv-05302<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     PARTIES ................................................................................................................2

        A.      Plaintiffs ....................................................................................................2

        B.      Defendant ...................................................................................................3

III.    JURISDICTION AND VENUE ............................................................................3

IV.     DIVISIONAL ASSIGNMENT ..............................................................................4

V.      FACTUAL ALLEGATIONS .................................................................................4

        A.      The Android Platform and Google Play Store Supposedly Offer Privacy Controls
                to Prevent Third Parties from Tracking Their Web Browsing ............................4

        B.      Meta Uses Consumer Data To Sell Targeted Advertising ..................................7

        C.      Meta Uses Technology Integrated into Third Party Websites to Collect Consumer
                Information ...............................................................................................8

        D.      Meta Exploits the Android Platform's Vulnerabilities to De-Anonymize Android
                Users' Web Browsing Data ...........................................................................11

        E.      Neither Android Users nor Websites Consent to Meta's Conduct .....................17

        F.      The Information Meta Acquires without Plaintiffs' and Class Members' Consent
                has Actual, Measurable, Monetary Value .......................................................17

VI.     CLASS ACTION ALLEGATIONS ......................................................................18

VII.    CLAIMS FOR RELIEF ........................................................................................20

VIII.   PRAYER FOR RELIEF .......................................................................................36

IX.     DEMAND FOR JURY TRIAL ............................................................................37

Plaintiffs Joanne Harris and Terry Paul (together, "Plaintiffs") bring this action, individually on behalf of themselves and as a class action on behalf of all others similarly situated, against Defendant Meta Platforms, Inc., ("Meta" or "Defendant"). The allegations contained herein are based on personal knowledge as to Plaintiffs and upon information and belief as to all other topics.

## I.    INTRODUCTION

1.    This class action arises from surreptitious tracking of Android device users' web browsing activity by Meta. On June 3, 2025, an *Ars Technica* report revealed that "Meta and [technology company] Yandex[1] are de-anonymizing Android users' web browsing identifiers," which "allows Meta and Yandex to attach persistent identifiers to detailed browsing histories" that they collect through pixels installed on various webpages.[2]

2.    From September 2024 to at least June 2, 2025, when users visited one of the millions of websites that incorporate Meta's pixel on their Android devices on Chromium-based browsers including Google Chrome, Mozilla Firefox, and Microsoft Edge, Meta passed identifying data from the web browser to the Instagram and Facebook apps that had been installed on the same devices. This allowed Meta to link profiles that users had created on these apps, allowing Meta to profit by using this de-anonymized user data to target advertising.

3.    As the researchers who discovered this scheme explained, "this method effectively allows [Meta] to link mobile browsing sessions and web cookies to user identities, hence de-anonymizing users' visiting sites embedding their scripts."[3] This new web-to-app ID sharing method "bypasses typical privacy protections such as clearing cookies, Incognito Mode and Android's permission controls. Worse, it opens the door for potentially malicious apps eavesdropping on users' web activity."[4]

---

[1] Yandex is a Russian technology company that provides a web browser, search engine, cloud computing, online food ordering, streaming media, online shopping, and rideshare services. Yandex offers a number of apps that can be installed and used on Android devices.

[2] Dan Goodin, *Meta and Yandex are de-anonymizing Android users' web browsing identifiers*, Ars Technica (June 3, 2025, at 08:00 ET), https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/.

[3] Aniketh Girish, et al., *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, Local Mess (June 3, 2025), https://localmess.github.io/.

[4] *Id.*

4.      Meta achieved this privacy violation by abusing a vulnerability in the Android platform. Meta specifically targeted Android systems due to Google's imposition of "fewer controls on local host communications and background executions of mobile apps."[5]

5.      These actions constitute a severe breach of the privacy rights of millions of Android users throughout the United States and a circumvention of Google's policy of "sandboxing" apps on Android devices so that one app does not share data with another. The practical effect is that, when users browse the web on their Android devices that are logged into Meta apps, without users' consent, Meta is receiving real-time data on what they are reading, watching, buying, searching and communicating, and can attribute this data to the personal information included in the users' Facebook and/or Instagram profiles for later monetization through targeted advertising.

6.      Plaintiffs seek to remedy these harms individually and on behalf of all those similarly situated, whose data privacy was violated as a result of Meta's unlawful conduct. Accordingly, Plaintiffs, individually and on behalf of the Classes (defined below), assert claims for (i) violations of California Invasion of Privacy Act, Cal. Penal Code § 630, *et seq.* ("CIPA"); (ii) violation of Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1) ("ECPA"); (iii) intrusion upon seclusion; (iv) invasion of privacy; (v) violation of the California Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"); and (vi) unjust enrichment.

## II.     PARTIES

### A.     Plaintiffs

7.      Plaintiff Joanne Harris ("Plaintiff Harris") is a citizen of Pennsylvania and resides in Philadelphia, Pennsylvania. Plaintiff Harris was a citizen of California and resident of Los Angeles, California from before September 2024 until March 2025. Plaintiff owns a Samsung S24 Plus Android phone on which she has installed and logged into her Instagram account via the Instagram app. Between September 2024 and June 2, 2025, Plaintiff Harris used the Chrome browser on her Android phone to access various websites on which the Meta Pixel has been installed, including, *inter alia*, zillow.com and

---

[5] Dan Goodin, *Meta and Yandex are de-anonymizing Android users' web browsing identifiers*, Ars Technica (June 3, 2025, at 08:00 ET), https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/.

lowes.com. On information and belief, when Plaintiff Harris visited these websites and other websites that included the Meta Pixel between September 2024 and June 2, 2025 from her Android phone, Meta improperly transmitted her web browsing activity to the Instagram app and with it her Instagram account. The full scope of Meta's interceptions of Plaintiff Harris's data can be determined only through formal discovery. Plaintiff Harris did not consent to Meta's interceptions of her data.

8.      Plaintiff Terry Paul ("Plaintiff Paul") is a citizen of California and resides in Fresno, California. Plaintiff Paul owns a Samsung 20 Plus Android phone on which she has installed and logged into her Facebook account via the Facebook app. Between September 2024 and June 2, 2025, Plaintiff Paul used the Chrome browser on her Android phone to access various websites on which the Meta Pixel has been installed, including, *inter alia*, zillow.com and usps.com. On information and belief, when Plaintiff Paul visited these websites and other websites that included the Meta Pixel between September 2024 and June 2, 2025 on her Android phone, Meta improperly transmitted her web browsing activity to the Facebook app and with it her Facebook account. The full scope of Meta's interceptions of Plaintiff Paul's data can be determined only through formal discovery. Plaintiff Paul did not consent to Meta's interceptions of her data.

### B.    Defendant

9.      Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California 94025.

## III.    JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States, specifically the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*. This Court also has original diversity jurisdiction, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"): (a) Plaintiffs assert a class action involving more than 100 class members; (b) Plaintiff Harris is a citizen of a state different from Defendant, and more than two-thirds of the Class reside in states other than California; and (c) the aggregate amount in controversy, exclusive of interest and costs, is more than $5,000,000.00.

11.     This Court also has supplemental jurisdiction over the state common law and statutory claims pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal statutory claim over which this Court has original jurisdiction, that they form part of the same case or controversy.

12.     This Court has general personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with this District in that they operate and market their services throughout this District. Further, this Court has personal jurisdiction over Defendant because Defendant is headquartered in this District.

13.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b), and (c) because: a substantial part of the events or omissions giving rise to Plaintiffs and the Classes' claims occurred in this District, Defendant conducts a substantial amount of business in this District, and Defendant is headquartered in this District.

## IV.    DIVISIONAL ASSIGNMENT

14.     Pursuant to Northern District of California Local Rules 3-2(d) and 3-5(b), this action is filed in the San Francisco Division of the Northern District of California, where Defendant is headquartered and transacts significant business, and where at least four related cases—*Rose v. Meta Platforms, Inc.*, No. 3:25-cv-04674 (N.D. Cal.); *Vincent, et al. v. Meta Platforms, Inc., et al.*, No. 3:25-cv-04822 (N.D. Cal.); *Martin v. Meta Platforms, Inc.*, No. 3:25-cv-04830 (N.D. Cal.); and *Lee v. Meta Platforms, Inc., et al.*, No. 3:25-cv-04910 (N.D. Cal.)—are pending.

## V.    FACTUAL ALLEGATIONS

### A.    The Android Platform and Google Play Store Supposedly Offer Privacy Controls to Prevent Third Parties from Tracking Their Web Browsing

15.     Android is an operating system designed for touchscreen-based mobile devices including smartphones, tablets, and wearable devices. The Android operating system was first developed by Android Inc. before Google acquired Android in 2005.[6] Since 2008, consumers have been able to purchase mobile devices that use the Android platform.

---

[6] *Google exec: Android was "best deal ever,"* Reuters (Oct. 27, 2010, at 02:04 ET), https://www.reuters.com/article/business/google-exec-android-was-best-deal-ever-idUS560440888/.

16.     The Android platform is used on Pixel devices sold by Google as well as by other mobile devices made on third party manufacturers, such as Samsung and Motorola.[7]

17.     Today, approximately 133.4 million individuals in the United States own an Android device.[8]

18.     A number of apps are pre-installed on Android devices, including Google's Chrome web browser. In addition to the apps that have already been loaded onto Android devices at the time of purchase, consumers may download additional apps, including the Facebook and Instagram apps.

19.     Most commonly, Android users obtain apps through Google Play, a digital distribution service operated by Google that is the official app store for Android devices. Google Play is pre-installed on most Android devices.

20.     Google purports that it is "continually working on ways to weed out harmful apps" from Google Play to "keep users safe."[9] Google employs both human and automated review processes to evaluate mobile apps offered on Google Play, touting its "extensive review processes" as means to "help to prevent harmful apps from getting into the store and find live apps that require updating as we launch new standards for user safety."[10]

21.     Google advertises its Pixel phones as "designed to help protect you and your stuff, and to keep you in control."[11] Google tells consumers that its Pixel phones are "[s]ecure to the core" and "private by design," with "protection and controls" to protect consumer privacy.[12]

---

[7] *Phones*, Android, https://www.android.com/phones/shop/ (last visited June 20, 2025).
[8] *iPhone vs Android Statistics*, Backlinko (last updated Mar. 31, 2025), https://backlinko.com/iphone-vs-android-statistics.
[9] *How we help keep Google Play safe for users and developers*, Google Safety Center, https://safety.google/intl/en_us/stories/google-play-safety/ (last visited June 20, 2025).
[10] *Id.*
[11] *Pixel*, Google Safety Center, https://safety.google/pixel/ (last visited June 20, 2025).
[12] *Id.*

# Pixel helps keep you and your data safe.

**Secure to the core**
Your data is protected by multiple layers of security.

**Private by design**
Machine learning intelligence that can help keep your data private.

**Protection and controls**
Manage your privacy settings for what you download, browse, and share.

**Personal safety**
Get help when you need it most. Pixel keeps you prepared for emergencies.

**Built-in authentication**
With secure authentication features, Pixel ensures only you have access to your phone.

22.     When an Android user navigates to a website from their device, the browser sends an HTTP "GET" request to the website's server asking for the server to send back HTML code that will allow the browser to display the website's content.

23.     When websites respond to browser GET requests, they may embed additional code within their reply transmissions, including third-party tracking scripts, cookies, or pixels that can then transmit a user's website activity instantaneously to third-party tracking companies for advertising purposes.

24.     A "cookie" is a small text file that a website server transmits to a user's browser and can be stored on the user's device. Cookies can either be first-party or third-party cookies. First-party cookies are generally used for website functionality, while third-party cookies are typically used to track users across websites and serve them targeted advertisements. In many cases, a third-party cookie will assign a unique ID that allows the user to be identified.[13]

25.     Another means of tracking a user's website interactions is a pixel. A pixel (also known as a web beacon, clear GIF, or web bug) is a discreet, single-pixel image embedded in a webpage or email to monitor user interactions. By design, a pixel is not visible to the human eye. A pixel enables the server hosting the image to gather data such as the user's device type, operating system, IP address, the time the

---

[13] Kavya, *All About Internet Cookies*, CookieYes (June 2, 2025), https://www.cookieyes.com/blog/internet-cookies/.

CLASS ACTION COMPLAINT
CASE NO.: 25-CV-05302

content was accessed, and whether any related cookies are already stored in the browser. This mechanism helps identify user behavior without requiring visible elements or direct interaction.[14]

26.    Google claims that Android users can "personalize [their] privacy experience" by altering their privacy settings and controlling their application permissions to avoid tracking.[15]

**B.    Meta Uses Consumer Data To Sell Targeted Advertising**

27.    Meta offers consumers an array of technology products. Meta's two principal app products are Facebook and Instagram. Both the Facebook and Instagram apps can be installed and used on Android devices.

28.    Facebook is an enormously popular social media platform, with about 3 billion monthly average users globally. Facebook has nearly 195 million U.S. users.[16]

29.    Instagram, a photo and video sharing app, is also very widely used, with 171.7 million users in the United States.[17]

30.    Meta's revenue comes almost entirely from selling targeted advertising using its vast trove of user data. Meta generates "substantially all" of its revenue from selling advertisements to marketers.[18] In 2024, Meta generated over $160 billion in annual advertising revenue.[19]

31.    According to Meta, its ad targeting and measurement tools "incorporate data signal from user activity on websites and services that [it] does not control," and "any changes in [its] ability to use such signals will adversely affect [its] business."[20]

32.    Meta maintains profiles of Facebook users that include the users' names, locations, email addresses, friends, "likes," and communications. Meta associates this information with personal

---

[14] Patti Croft, *What Is a Web Beacon and Why Should You Care?* (last updated Feb. 19, 2025), https://allaboutcookies.org/what-is-a-web-beacon.
[15] *Privacy Settings and Permissions*, Android, https://www.android.com/safety/privacy/#safety-privacy-dashboard (last visited June 20, 2025).
[16] *Facebook User & Growth Statistics*, Backlinko (Jan. 30, 2025), http://backlinko.com/facebook-users.
[17] *Instagram Statistics: Key Demographic and User Numbers*, Backlinko (last updated Mar. 11, 2025), https://backlinko.com/instagram-users.
[18] Meta Platforms, Inc., Form 10-K (Jan. 30, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/1f8bf8eb-a7ee-4d0c-979c-ca0f22cf633f.html.
[19] *Id*.
[20] *Id*.

CLASS ACTION COMPLAINT
CASE NO.: 25-CV-05302

identifiers, including IP addresses, cookies, and device identifiers. The user data Meta collects is significantly more valuable when it can be associated with a user's Facebook or Instagram account.

33.     Meta's data tracking capabilities allow it to target users with advertisements that it has gathered about them across the internet, including on websites that use the Meta Pixel. Meta compiles the data it collects into datasets that advertisers use to target their marketing.

**C.    Meta Uses Technology Integrated into Third Party Websites to Collect Consumer Information**

34.     To facilitate its advertising business, Meta collects vast amounts of user data such as interests, behavior, and demographics using its own pixel, the Meta Pixel. The Meta Pixel is integrated into millions of websites, including 30% of the most popular websites.[21]

35.     The Meta Pixel is a free and publicly available piece of JavaScript code that Meta provides third-party web developers to integrate into their websites to "measure, optimize and build audiences for . . . ad campaigns."[22]

36.     The Meta Pixel is a pixel sized dot (with a 1 x 1 pixel dimension) that is nearly invisible to the website visitor. By design, the Meta Pixel is invisible to website visitors.

37.     The Meta Pixel collects detailed and granular data from users' interaction with the webpages on which it is installed and can  expose sensitive information, including financial and health data.

38.     According to Meta, the Meta Pixel can collect "IP addresses, information about the web browser, page location, document, referrer and person using the website"; button click data including "any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks"; form field names and values if selected by the website owner; and other optional values.[23] The Meta Pixel can capture at least seventeen standard events including payment information, event

---

[21] *Facebook's Pervasive Pixel*, The Markup (Aug. 20, 2022, at 08:00 ET), https://themarkup.org/news letter/hello-world/facebooks-pervasive-pixel.
[22] *Meta Pixel*, Meta, https://developers.facebook.com/docs/meta-pixel/ (last visited on June 20, 2025).
[23] *Id.*

CLASS ACTION COMPLAINT
CASE NO.: 25-CV-05302

registration, product customization, donations, purchases, scheduling information such as appointments, searches applications, and content viewed.[24]

39.    Once a website has installed the Meta Pixel, Meta begins collecting information when the Meta Pixel fires when a webpage is loaded or when a visitor clicks on a link, submits a form, or performs another tracked action. Each action taken by the visitor triggers an event that is communicated to a Meta server through a "GET request" (and sometimes a "POST request") performed by the Metal Pixel. This data collection allows to build a detailed history of activity per visitor that it can use to target advertising. Every action creates a log action or dataset which records an activity that the third party wants to track. All of these tracked actions are then stored so that the third party can analyze the data collected.[25]

40.    Specifically, when a user visits a website that has the Meta Pixel embedded, the Meta Pixel will download a series of cookies onto the user's device with unique identifiers that allow Meta to track that user, including the "c_user," "fr," and "_fbp" cookies. These are different types of cookies that perform different functions for Meta.

41.    The c_user cookie contains a unique identifier linked to an individual's Facebook account that necessarily reveals a consumer's Meta social media profile. For example, appending the c_user value to the Facebook URL reveals the consumer's Facebook profile. If the c_user value is 123456, the corresponding user profile can be accessed at www.facebook.com/123456. This cookie enables Facebook to uniquely identify a user and associate their activity on external websites with their Facebook profile.

42.    The fr cookie is a browser-based tracking tool used by Meta to support personalized advertising and collect usage analytics. It includes a unique ID that allows Meta to monitor user activity across multiple sites and devices, building insights into user behaviors and interests. In contrast to the c_user cookie, which is tied specifically to authenticated Facebook users, the fr cookie can track both Facebook account holders and  non-users  alike. This means Meta can gather  data on individuals even if they're not actively logged into or registered on Facebook.

---

[24] Casandra Campbell, *What is Meta Pixel? How to Set It Up For Retargeting Ads*, Shopify (Feb. 16, 2025), https://www.shopify.com/blog/72787269-relax-advertising-on-facebook-just-got-a-lot-easier.
[25] *See* Ted Vrountas, *What is the Meta Pixel & What Does it Do?*, Instapage, https://instapage.com/blog/meta-pixel (last visited June 20, 2025).

CLASS ACTION COMPLAINT
CASE NO.: 25-cv-05302

43.    The _fbp cookie is a unique identifier that is set by Facebook source code and associated with a given website using the Meta Pixel.

44.    The _fbp cookie is a third-party cookie because it is associated with Meta and is used to associate information about a user and their communications with non-Meta entities while the user is on a non-Meta website or application.

45.    Meta configures the _fbp cookie to be set as a first-party cookie even though it is Meta's cookie on non-Meta websites.

46.    The Meta Pixel enables Meta to intercept users' communications. When the Meta Pixel is embedded on a website, its script will cause a user's browser to duplicate and transmit communications that the user sends to the website and transmit that information instantaneously to Meta, along with cookie values, browser, and device information.

47.    Examples abound of Meta collecting users' sensitive communications with websites via the Meta Pixel. For instance, hundreds of pregnancy crisis centers have shared visitor information, including appointment scheduling, name, email address, and phone number, with Meta via the Meta Pixel.[26] Meta was also found to have collected sensitive financial information from visitors to tax preparation websites, including tax filing status, adjusted gross income, and refund amounts using the Meta Pixel.[27] The Meta Pixel has also sent Meta information about users' visits to suicide prevention websites and calls to mental health crisis lines.[28]

48.    The Meta Pixel is designed to receive information about a website user's actions in real time. As soon as a website user takes any action on a webpage that has incorporated the Meta Pixel, the

---

[26] Grace Oldham and Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, The Markup (June 15, 2022, at 06:00 ET), https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients.
[27] Simon Fondrie-Teitler, et al., *Tax Filing Websites Have Been Sending Users' Financial Information to Facebook*, The Markup (Nov. 28, 2022, at 08:00 ET), https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook.
[28] Colin Lecher and Jon Keegan, *Suicide Hotlines Promise Anonymity. Dozens of Their Websites Send Sensitive Data to Facebook*, The Markup (June 13, 2023, at 14:54 ET), https://themarkup.org/pixel-hunt/2023/06/13/suicide-hotlines-promise-anonymity-dozens-of-their-websites-send-sensitive-data-to-facebook.

CLASS ACTION COMPLAINT
CASE NO.: 25-cv-05302

Meta Pixel directs the user's communications to Meta while communication between the website user and the website is still occurring.

49.     Through its Meta Pixel data collection, Meta is able to provide its marketing partners with direct and detailed insight into individuals' activities, allowing them to track website visitor actions, define custom audiences to better target ads to potential customers, and create lookalike audiences to "reach new people who are likely to be interested in [their] business because they share similar characteristics to [the business's] existing customers."[29]

50.     Generally, whether the website visitor's information is collected through the Meta Pixel using first- or third-party cookies or compounded with the habits, interests and history gathered from the user's Facebook or Instagram account, the JavaScript code embedded on a website allows only the tracking of a user under a pseudonym but not their real identity. This is a major drawback on tracking as it renders the attribution of history of activities to a real user (not a pseudonym) almost impossible. However, as described below, from September 2024 until June 3, 2025, Meta exploited a vulnerability in the Android platform that allowed it to attribute Android users' web browsing activity to their Facebook and/or Instagram accounts.

**D.     Meta Exploits the Android Platform's Vulnerabilities to De-Anonymize Android Users' Web Browsing Data**

51.     Privacy norms have arisen in the tech space that facilitate consumer control over information and privacy.

52.     Many users attempt to limit the information that Meta can collect about their web browsing and to prevent Meta from associating any data it collects from their activity on Meta's own platforms. For example, users regularly opt not to share identifying information with Meta and to disable the c_user cookie. When users do this, they believe that Meta will not be able to track their identity with their browsing activity.[30]

---

[29] *About Lookalike Audiences*, Meta, https://en-gb.facebook.com/business/help/164749007013531?id=401668390442328 (last visited June 20, 2025).
[30] *Delete, allow and manage cookies in Chrome*, Google, https://support.google.com/chrome/answer/95647?hl=en&co=GENIE.Platform%3DAndroid (describing how to delete and block third-party cookies on an Android device) (last visited June 20, 2025).

CLASS ACTION COMPLAINT
CASE NO.: 25-cv-05302

53.     Users may also opt to block, delete, or clear third-party cookies in an effort to limit tracking. However, if a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted–even though it is a Meta cookie–again, because Meta has disguised it as a first-party cookie.

54.     Along with giving users control of various privacy options, a technique called "sandboxing" has become "one of the fundamental security principals that exists in the web, as well as the mobile system[.]"[31] Sandboxing isolates mobile apps (including web browsers) operating on the same device from one another in order to protect each app, as well as the system as a whole, from malicious applications. When they are sandboxed, apps do not interact with each other and have limited access to the operating system.

55.     The Android platform is designed to sandbox applications. Explaining its sandboxing arrangement, Google explains that "[i]f app A tries to do something malicious, such as read app B's data or dial the phone without permission, it's prevented from doing so . . . . The sandbox is simple, auditable, and based on decades-old . . . separation of processes and file permissions."[32]

56.     Similarly, all major web browsers make attempts to prevent browsers site cookies from one website from tracking users across other websites.

57.     For example, Mozilla's Firefox browser employs "state partitioning" to "mitigate the ability of websites" to engage in cross-site tracking.[33] This technical process does not prevent technologies like cookies from tracking consumer behavior on websites, but it does prevent an ad tracking technology from storing an identifier that can be retrieved from multiple websites and used to identify a user's online behavior.[34]

---

[31] Dan Goodin, *Meta and Yandex are de-anonymizing Android users' web browsing identifiers*, Ars Technica (June 3, 2025, at 08:00 ET), https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/.

[32] *Application Sandbox*, Android, (last updated June 18, 2025), https://source.android.com/docs/security/app-sandbox.

[33] *State Partitioning*, Mozilla (last modified Apr. 3, 2025), https://developer.mozilla.org/en-US/docs/Web/Privacy/Guides/State_Partitioning.

[34] *Id.*

58.    Likewise, Google's Chrome browser uses "storage partitioning" to prevent websites from tracking users across the web.[35]

59.    If a browser app's functionality is adequately sandboxed, a given application installed on a user's device will not be able to access information from another application, including a web browser, installed on the same device. This "cut[s] off access to sensitive data or privileged system resources."[36]

60.    Meta circumvented the protections that Google built into Android and Chrome in order to share data from the Chromium-based browsers including the Google Chrome, Mozilla Firefox, and Microsoft Edge browsers, with their own apps.[37] Meta formed secret software connection between Android users' web browsers and locally-installed applications that allowed them to de-anonymize users' online activity.

61.    Since at least 2017, Android's operating system has featured a vulnerability that allowed app developers to breach the operating system's sandboxes and "bypass core security and privacy protections provided by both the Android operating system and browsers that run on it."[38]

62.    Researchers discovered that, from September 2024 until June 3, 2025, Meta was able to covertly transmit the _fbp cookie and other data from mobile browsers to native Facebook and Instagram apps using WebRTC STUN messages over local UDP ports.[39] Using this process, Meta was able to correlate the _fbp cookie—which is an ostensibly anonymous browser identifier—with the account an Facebook and Instagram users who were logged in to the Facebook and Instagram apps when they used the Chrome and Microsoft Edge browser apps.[40]

63.    This communication was not visible to users, did not seek user consent, and was able to bypass Incognito Mode, cookie clearing, and Android permission mechanisms.

[35] Google, *Storage Partitioning*, Privacy Sandbox, https://privacysandbox.google.com/cookies/storage-partitioning#:~:text=for%20further%20discussion.-,What%20is%20storage%20partitioning%3F,the%20user%20across%20the%20web.

[36] Dan Goodin, *Meta and Yandex are de-anonymizing Android users' web browsing identifiers*, Ars Technica (June 3, 2025, at 08:00 ET), https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/.

[37] *Id.*

[38] *Id.*

[39] Aniketh Girish, et al., *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, Local Mess (June 3, 2025), https://localmess.github.io/.

[40] *Id.*

64.    Meta's tracking technique transmitted intercepted data instantaneously along with persistent user identifiers—effectively de-anonymizing users and linking their browsing activity to their Meta profiles.

65.    When an Android user navigated to a website with the Meta Pixel embedded in it, the Meta Pixel instructed the user's browser to send a separate message to Meta's external servers simultaneously. This separate message included data collected by the Pixel as well as cookie data. At the same time, cookie data was passed through the Android device's local capabilities and paired with the identity of the logged-in user of the Facebook or Instagram applications.

66.    This process enables Meta to "link pseudonymous web identities with actual user identities, even in private browsing modes."[41]

67.    Meta specifically targets "only Android users" through this process. However,

> [S]imilar data sharing between iOS browsers and native apps is technically possible. iOS browsers, which are all based on WebKit, allow developers to programmatically establish localhost connections and apps can listen on local ports. It is possible that technical and policy restrictions for running native apps in the background may explain why iOS users were not targeted by these trackers.[42]

68.    The technical flow of Meta's process is as follows:[43]

- The user opens the native Facebook or Instagram app, which eventually is sent to the background and creates a background service to listen for incoming traffic on a TCP port and a UDP port. Users need to be logged in with their credentials on the apps but they remain perpetually logged in whilst the apps are running in the background.

- The user opens their browser and visits a website that hosts the Meta Pixel.

- At this stage, some websites wait for users' consent before embedding Meta Pixel.

---

[41] Dan Goodin, *Meta and Yandex are de-anonymizing Android users' web browsing identifiers*, Ars Technica (June 3, 2025, at 08:00 ET), https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/.

[42] Aniketh Girish, et al., *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, Local Mess (June 3, 2025), https://localmess.github.io/.

[43] *Id.*

CLASS ACTION COMPLAINT
CASE NO.: 25-CV-05302

However, research indicates that a majority of websites do not ask for users' consent.

• The Meta Pixel script is loaded and the _fbp cookie is sent to the native Instagram or Facebook app. The Meta Pixel script also sends the _fbp value in a request to https://www.facebook.com/tr along with other parameters such as page URL (dl), website and browser metadata, and the event type (ev) (e.g., PageView, AddToCart, Donate, Purchase).

• In the final step, the Facebook or Instagram apps receive the _fbp cookie from the Meta JavaScripts running on the browser and transmits it to the GraphQL endpoint along with other persistent user identifiers, linking users' fbp ID (web visit) with their Facebook or Instagram account.

69.    Put differently, Meta "insert[ed] key_fbp cookie content into" "a real-time peer-to-peer communication protocol commonly used for making audio or video calls in the browser," "caus[ing] the browser to send that data . . . to the Android local host, where the Facebook or Instagram app can read it and link it to the user."[44] This means Meta de-anonymized and linked Android users' browsing information to their Facebook and Instagram accounts in real time.

---

[44] Dan Goodin, *Meta and Yandex are de-anonymizing Android users' web browsing identifiers*, Ars Technica (June 3, 2025, at 08:00 ET), https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/.

CLASS ACTION COMPLAINT
CASE NO.: 25-CV-05302

70.     In other words, Meta was able to correlate the _fbp cookie—which is an ostensibly anonymous browser identifier—with the account of a logged in Instagram or Facebook user.

71.     Meta accomplished this by abusing access to "local host sockets" which allow applications, such as Facebook and Instagram, to "listen" and read data transmitted by the browsers.[45]

### E.    Neither Android Users nor Websites Consent to Meta's Conduct

72.     Meta did not disclose its surreptitious new techniques for tracking Android users across websites and de-anonymization to the users that they tracked or to the web developers who installed the technology enabling the tracking into their websites.

73.     Meta shared information between web browsers used on Android devices and their own apps without seeking or obtaining users' consent to link their browsing activity in this manner.

### F.    The Information Meta Acquires without Plaintiffs' and Class Members' Consent has Actual, Measurable, Monetary Value

74.     Meta's services are not free. Rather than paying a fee to use Facebook and Instagram, users of these services agree to provide Meta a data license to collect certain data, including data that Facebook users provide when signing up for Meta and when using Meta platforms on Meta properties—subject to limitations in Meta's contract.

75.     Meta obtains substantial revenues from the collection and use of user data for targeted ads. For example, one way that Meta and other data companies report on the value of business is through average revenue per person or "ARPP." Meta reports its ARPP in filings with the United States Securities and Exchange Commission.

76.     In its 2024 Form 10-K, Meta reported total advertising revenue of about $15 billion in the United States and ARPP of $49.63 for the year 2024.[46]

77.     The value of this consumer information is further demonstrated by the fact that several companies, including Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect pay consumers for a license to track certain information.

---

[45] *Id.*
[46] Meta Platforms, Inc., Form 10-K (Jan. 30, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/1f8bf8eb-a7ee-4d0c-979c-ca0f22cf633f.html.

CLASS ACTION COMPLAINT
CASE NO.: 25-05302

78.    In fact, Meta itself previously paid users for their digital information. Until 2019, Meta ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers.[47]

79.    Meta profits considerably from their wrongful data collection on the Android platform, as their advertising business depends on compiling as much data about users as possible to enable the greatest precision for ad targeting

## VI.    CLASS ACTION ALLEGATIONS

80.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class and Sub-Class:

> **Nationwide Class (the "Class"):** All Android mobile device users in the United States who: (1) while logged into the Facebook app or Instagram app on their Android device; (2) visited a website on their Android device using the Google Chrome, Mozilla Firefox, and/or Microsoft Edge browsers between September 2024 and June 2, 2025; and (3) whose browsing information was collected by Meta.

> **California Sub-Class (the "California Sub-Class" or "Sub-Class"):** All Android mobile device users in California who: (1) while logged into the Facebook app, or Instagram app on their Android device; (2) visited a website on their Android device using the Google Chrome, Mozilla Firefox, and/or Microsoft Edge browsers between September 2024 and June 2, 2025; and (3) whose browsing information was collected by Meta.

81.    Excluded from the Class and Sub-Class are Defendant and its parents, subsidiaries, and corporate affiliates. Plaintiffs reserve the right to revise the definition of the Class and Sub-Class based upon subsequently discovered information and reserves the right to establish additional Sub-Classes where appropriate. The Class and Sub-Class are collectively referred to herein as the "Class" or "Classes."

---

[47] Casey Newton, *Facebook has been paying teens $20 a month for total access to their phone activity*, The Verge (Jan. 29, 2025, at 19:18 ET), https://www.theverge.com/2019/1/29/18202880/facebook-research-enterprise-root-certificate-onavo-techcrunch.

82.    The Classes are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are millions of proposed members of the Classes throughout the United States.

83.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

        a.    Whether Defendant engaged in the wrongful conduct alleged herein;

        b.    Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

        c.    Whether Defendant's conduct alleged herein violated privacy rights and invaded Plaintiffs' and Class members' privacy;

        d.    Whether Defendant's conduct violates ECPA, CIPA, CDAFA, or any other relevant statute;

        e.    Whether Defendant was unjustly enriched by their violation of Class members' privacy; and

        f.    Whether Plaintiffs and the Class Members are entitled to damages, and the measure of damages, statutory damages, or other relief.

84.    Plaintiffs' claims are typical of the claims of the Classes that Plaintiffs seek to represent. As alleged herein, Plaintiffs and the Classes sustained damages arising out of the same unlawful actions and conduct by Defendant.

85.    Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interest adverse to or in conflict with, the interests of the other members of the Classes.

86.    Plaintiffs' interests are co-extensive with, and are not antagonistic to, those of absent members within the Classes. Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

87.     Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

88.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

89.     Class action status is warranted under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

90.     The interest of members within the Classes individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

91.     The nature of notice to the proposed Classes is contemplated to be by direct mail and/or email upon certification of the Classes or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers, and/or on the internet.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of The California Invasion of Privacy Act, Cal. Penal Code § 631(a)

92.     Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

93.     Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

94.     The California Legislature enacted the CIPA, Cal. Penal Code §§ 630, *et seq.*, to address:

> [a]dvances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

*Id.* at § 630.

95.     Although the "declaration of policy" for CIPA provides that CIPA is intended "to protect the right of privacy of the people of this state," (*Id.*) CIPA Section 637.2—titled "Civil action by person injured; injunction"—provides that an action under CIPA can be brought by "*[a]ny person* who has been injured by a violation of this chapter . . . against the person who committed the violation" Cal. Penal Code § 637.2 (emphasis added). To establish liability under section 631(a), Plaintiffs need only establish that a Defendant, "by means of any machine, instrument, or contrivance, or in any other manner," did any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable or is being sent from, or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

96.     To avoid liability under CIPA § 631(a), a defendant must show it had the consent of *all* parties to a communication, and that such consent was procured *prior to* the interception occurring.

97.     Meta maintains its headquarters in California, where it read, attempted to read, or learned the contents or meaning of Plaintiffs' and Class Members' communications with websites they visited that had integrated the Meta Pixel.

98.     The Meta Pixel is a "machine, instrument, or contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here. Cal. Penal Code § 631(a).

CLASS ACTION COMPLAINT
CASE NO.: 25-cv-05302

99.     Meta is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Meta has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operators.

100.     Accordingly, Meta was a third party to any communication between Plaintiffs and Class Members, on the one hand, and any of the websites at issue, on the other.

101.     At all relevant times, Meta willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents the electronic communications of Plaintiffs and Class Members, on the one hand, and the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

102.     At all relevant times, Meta used those intercepted communications, including but not limited to de-anonymizing and identifying Plaintiffs and Class Members through the signals sent on the Android communication channels, using all of this information to build comprehensive audiences for advertisers, and selling access to those audiences to interested advertisers for a profit.

103.     Neither Plaintiffs nor Class Members nor website operators provided their prior consent to Meta's intentional interception, reading, learning, recording, collection, de-anonymization, and usage of Plaintiffs' and Class Members' electronic communications.

104.     The wiretapping of Plaintiffs and Class Members occurred in California, where Plaintiffs and California Subclass Members accessed the websites, where the Meta Pixel was loaded on Plaintiffs' and Class Members' browsers, where Meta used the Android communication channels to de-anonymize and identify Plaintiffs and Class Members. Further, the wiretapping of Plaintiffs and Class Members occurred in California where Meta routed Plaintiffs' and Class Members' electronic communications to Defendant's servers, which were located in California where Meta is headquartered.

105.     Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as other equitable relief.

1

2

**SECOND CLAIM FOR RELIEF**

**Violation of The California Invasion of Privacy Act, Cal. Penal Code § 635**

3       106.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

4       107.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

5       108.    CIPA § 635(a) prohibits an entity from "manufactur[ing], assembl[ing], sell[ing],

6  offer[ing] for sale, advertis[ing] for sale, possess[ing], transport[ing], import[ing], or furnish[ing] to

7  another any device which is primarily or exclusively designed or intended for eavesdropping upon the

8  communication of another."

9       109.    Both the Meta Pixel and the code Meta uses to tie users' communications with websites to

10 their identities are "devices" "primarily or exclusively designed or intended for eavesdropping upon the

11 communication of another." *Id*.

12      110.    Meta manufactured, assembled, advertised or offered for sale, and possessed these devices.

13      111.    Meta's use of these devices on the various websites that Plaintiffs and Class Members

14 visited caused Plaintiffs and Class Members real and concrete harm, including but not limited to Meta's

15 unjust enrichment and the loss of control of their personal information. Accordingly, Plaintiffs and Class

16 Members may bring a claim for Meta's violation of CIPA § 635 because they have been injured by the

17 same. *See Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *7 (N.D. Cal. Dec. 30, 2024).

18      112.    Neither Plaintiffs nor Class Members nor website operators provided their prior consent to

19 Defendant's manufacturing or use of these wiretapping devices.

20      113.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by

21 Defendant's violations of CIPA § 635, and each seek statutory damages in accordance with § 637.2(a),

22 which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages

23 sustained by Plaintiffs and the Class in an amount to be proven at trial, as well other equitable relief.

24

**THIRD CLAIM FOR RELIEF**

25

**Violation of The California Invasion of Privacy Act, Cal. Penal Code § 638.51(a)**

26      114.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

27      115.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

28

CLASS ACTION COMPLAINT
CASE NO.: 25-cv-05302

116.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

117.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

118.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

119.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

120.    For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

121.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices. This, combined with the California Supreme Court's mandate to read provisions of the CIPA broadly to protect privacy rights, has led courts to apply CIPA § 638.50 to internet tracking technologies. *See*, *e.g.*, *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. L.A. Times Commc'ns LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec.12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v.*

*Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register").

122. The code Meta installs on Android users' browsers that enables Meta to tie users' communications with their Facebook or Instagram profiles is a "device or process" that "identifies the source of visitors to [] website[s]," and is therefore a "pen register." *Heiting v. FKA Distributing Co.*, 2025 WL 736594, at *3 (C.D. Cal. Feb. 3, 2025).

123. In the alternative, this code is a "trap and trace device" because it is a "device or process" that "identif[ies] the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" Cal. Penal Code § 638.50 (i.e., Plaintiffs and Class Members who are communicating with websites and are being de-anonymized by Meta's code).

124. At all relevant times, Meta installed or used the pen register or trap and trace device on various websites and the Android communication channels, enabling Meta to de-anonymize and identify Plaintiffs and Class Members by tying their browsing information to their Facebook and Instagram profiles.

125. Neither Plaintiffs nor Class Members nor website operators provided their prior consent to Meta's installation or use of the pen register or trap and trace device. Nor did Meta obtain a court order enabling it to do the same.

126. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Meta's violations of CIPA § 638.51(a), and each seeks statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well other equitable relief.

## FOURTH CLAIM FOR RELIEF

**Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), *et seq.***

127. Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

128. Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

CLASS ACTION COMPLAINT
CASE NO.: 25-CV-05302

129.    The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510, *et seq.*, prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

130.    The ECPA confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

131.    The ECPA protects both the sending and receipt of communications.

132.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

133.    In addition, "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication . . . while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

134.    "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

135.    "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

136.    "Contents" includes "any information concerning the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

137.    An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

138.    The transmission of Plaintiffs' and members of the Classes' website page visits, browsing and search information, and persistent identifiers each qualify as electronic communications under the ECPA's definition. 18 U.S.C. § 2510(12).

139.    The transmission of this information between Plaintiffs and members of the Classes, on the one hand, and each website with which they chose to exchange communications, on the other hand, are "transfer[s] of signs, signals, writing . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate . . . commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

140.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

141.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

142.    The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication." 18 U.S.C. § 2510(5).

143.    The following instruments constitute "devices" within the meaning of the ECPA: (i) the Meta Pixel; (ii) the code that enabled Meta to link browsing information with Facebook and Instagram profiles; and (iii) any other tracking code used by Meta.

144.    Plaintiffs and Class Members' interactions with each website on which the Meta Pixel has been installed are electronic communications under the ECPA.

145.    By using the methods described herein, Meta intentionally intercepted and/or endeavored to intercept the electronic communications of Plaintiffs and Class Members in real-time in violation of 18 U.S.C. § 2511(1)(a).

146.    Meta then monetized and thus used the intercepted communications for advertising purposes. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained

through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Meta violated 18 U.S.C. § 2511(1)(d).

147.    Meta was not acting under the color of law to intercept Plaintiffs' and Class Members' electronic communications.

148.    Plaintiffs and Class Members did not authorize Meta to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy.

149.    Plaintiffs and Class Members had a reasonable expectation that Meta would not intercept their communications, exploit the Android platform's design to de-anonymize that data and link it to their Facebook and/or Instagram accounts, and sell their data for advertising purposes without their knowledge or consent.

150.    The websites that Plaintiffs and Class Members visited did not authorize or consent to Meta's conduct, given Defendant's conduct constituted an abuse of Android security protocols and a violation of Google's terms.

151.    Meta's actions were at all relevant times knowing, willful, and intentional.

152.    The foregoing acts and omissions therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

153.    Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## FIFTH CLAIM FOR RELIEF

### Intrusion Upon Seclusion

154.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

155.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

156.    Intrusion upon seclusion has occurred when (1) Meta intruded into a private place, conversation, or matter; (2) in a manner that was highly offensive to a reasonable person.

157.     Meta intentionally intruded on Plaintiffs' and the Classes' solitude or seclusion when it collected Plaintiffs' and Class Members' communications and interactions with third-party websites they accessed from their Android devices and exploited the Android platform to de-anonymize Plaintiffs' and Class Members' data by linking it to their Facebook and/or Instagram accounts.

158.     Plaintiffs and Class Members did not consent to or authorize, nor were they aware of: (1) third party websites' disclosure of data to Meta; and (2) Meta's exploitation of the Android platform to de-anonymize data in contravention of the Android platform's intended design and industry privacy norms at the time that the disclosure occurred. Plaintiffs and Class Members never agreed that the operators of websites using Meta Pixel could disclose their communications to Meta, nor did they agree that Meta could collect such information.

159.     Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

160.     By conducting widespread surveillance, Meta intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

161.     Plaintiffs and Class Members had a reasonable expectation of privacy in their web browsing activity on their Android devices. Plaintiffs and Class Members communicated information that they intended for only the websites they visited to receive and that they understood Meta would not track and that would be kept private.

162.     Plaintiffs and Class Members did not and could not authorize Meta to intercept data on every aspect of their lives and activities.

163.     Meta knew that Plaintiffs and Class Members were unaware that it was collecting their communications and interactions with third-party websites using the Meta Pixel and associating the collected data with their Facebook and Instagram accounts.

164.     The conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

a.    Meta engages in widespread data collection and interception of Plaintiffs' and members of the Classes' internet activity, including their communications with websites, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

b.    Meta abused a communication channel in violation of Google's policies to connect website information and Plaintiffs' and Class Members' Facebook and Instagram accounts, de-anonymizing and identifying Plaintiffs and Class Members and linking their browsing information with their identities;

c.    Meta combines the information collected on websites with users' identities for advertising purposes.

d.    Meta sells access or discloses this information, which contain the data improperly collected about Plaintiffs and Class Members, to an unknown number of advertisers who choose to advertise on the Facebook ecosystem, which likewise violates Plaintiffs' and Class Members' common law right to privacy and the control of their personal information.

165.    Meta's intentional collection of private and highly sensitive communications, including information obtained from Plaintiffs and Class Members' use of websites using the Meta Pixel through deceit is highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their communications with websites on which the Meta Pixel had been installed, would not be disclosed to third parties, including Meta, and would not be associated with their Facebook and/or Instagram accounts.

166.    Meta's reckless disregard for the privacy of Plaintiffs and Class Members is highly offensive to a reasonable person. Meta knew that its de-anonymization of user web browsing data was a serious invasion of its users' privacy that deliberately circumvented the privacy protections of the Android platform and users' browsers.

167.    Secret collection of Plaintiffs' and Class Members' interactions with the millions of websites using the Meta Pixel, is highly offensive to a reasonable person. Privacy polls and studies show

that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal information is collected or shared.

168.    Plaintiffs and Class Members have suffered harm and injury as a direct and proximate result of Meta's invasion of their privacy.

169.    Plaintiffs and Class Members are entitled to reasonable compensation, including but not limited to monetary damages.

170.    Plaintiffs and Class Members seek appropriate relief for that injury, including, but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits earned as a result of its intrusions upon Plaintiffs and Class Members' privacy.

171.    Plaintiffs also seek such other relief as the Court may deem just and proper.

## SIXTH CLAIM FOR RELIEF

### Invasion of Privacy in Violation of the California Constitution, art. 1, § 1

172.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

173.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

174.    Meta is headquartered in California and its conduct took place in California.

175.    Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

176.    The right to privacy in California's constitution creates a right of action against private entities such as Meta.

177.    To state a California constitutional privacy claim, a plaintiff must establish: (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy; and (3) conduct by the defendant constituting an intrusion of privacy so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

178.    Plaintiffs and Class Members possess a legally protected interest in browsing activity on their Android devices. This legally-protected interest is derived from the common law, the California

Constitution's article I, section 1 guarantee of the right to privacy, the ECPA, and CIPA. Plaintiffs and Class Members communicated information that they intended for only the websites they visited to receive and that they understood Meta would not track and that would be kept private.

179. Plaintiffs and Class Members had a reasonable expectation of privacy under the circumstances, including that Plaintiffs and Class Members did not consent or otherwise authorize Meta to collect their communications and interactions with third party website or to de-anonymize such data by associating it with their Facebook and/or Instagram accounts.

180. Meta's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that: (i) Meta obtained Plaintiffs' and Class Members' information under false pretenses and/or exceeded its authority to obtain such information; (ii) Meta designed code to exploit vulnerabilities in Google's Android software to collect Plaintiffs' and Class Members' online activity over time and connect it with their identities; (iii) Meta then sold Plaintiffs' private information and identity for profit; and (iv) Meta's invasion of Plaintiffs and Class Members' privacy constituted systemic surveillance.

181. Defendant's invasion violated the privacy rights of millions of Class Members, including Plaintiffs, without authorization or consent. Its conduct constitutes a severe and egregious breach of social norms.

182. As a direct and proximate result of Defendant's actions, Plaintiffs and Class Members have had their privacy invaded and have sustained damages and will continue to suffer damages.

183. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits earned as a result of their intrusions upon Plaintiffs' and Class Members' privacy.

184. Plaintiffs and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Meta's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

185. Plaintiffs also seek such other relief as the Court may deem just and proper.

CLASS ACTION COMPLAINT
CASE NO.: 25-CV-05302

**SEVENTH CLAIM FOR RELIEF**

**Violation of the California Computer Data Access and Fraud Act, Cal. Penal Code § 502**

186.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

187.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

188.    The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

189.    The Legislature further declared that:

> [P]rotection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

Cal. Penal Code § 502(a).

190.    For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

191.    The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

192.    The term "computer system" refers to:

> [A] device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control.

Cal. Penal Code § 502(b)(5).

193.    Plaintiffs' and Class Members' web browsers used to access the websites are "computer software," and the Android devices on which Plaintiffs and Class Members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

194.    The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." Cal. Penal Code § 502(b)(8). The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." *Id.*

195.    As discussed above, a website cookie value, including the Meta third-party tracker cookie, and Android users' browsing-activity information are both "data" within the meaning of the statute.

196.    Under California Penal Code § 502(c)(1), it is unlawful when someone "knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to . . . wrongfully control or obtain money, property, or data." Cal. Penal Code § 502(c)(1).

197.    The statute also makes it unlawful to access knowingly and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

198.    The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

199.    Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

200.    Based on Meta's unauthorized breach of the Android software to cause users' web browsers to send information to native applications on their devices to track and identify Plaintiffs' and Class Members' browsing activity, as alleged above, Meta knowingly accessed and without permission altered and used Plaintiffs' and Class Members' data and computer systems in violation of Penal Code § 502(c)(1).

201.    Similarly, the exploitation of the Android software by Meta violates subsection (c)(4) because Meta added and altered data and computer software on Plaintiffs' and Class Members' computers or computer systems. Cal. Penal Code § 502(c)(4).

202.    By exploiting the Android software, Meta also knowingly and without permission provided its trackers with a means of accessing Plaintiffs' and Class Members' computers, computer systems, and/or computer networks in violation of Cal. Penal Code §§ 502(c)(6) and (7).

203.    Further, Meta's unauthorized collection and use of Plaintiffs' and Class Members' personally identifying and addressing information violates Cal. Penal Code § 502(c)(2) because Defendant took and made use of sensitive data from Plaintiffs' and Class members' computers, computer systems, or computer networks.

204.    As a direct and proximate result of Meta's violations of the CDAFA, Plaintiffs and Class members have suffered damages. Under Cal. Penal Code § 502(e)(1), Plaintiffs and Class members are entitled to compensatory damages and other equitable relief in an amount to be determined at trial.

205.    Plaintiffs and Class Members suffered an economic injury when their data was misappropriated without their consent and used for Meta's profit. Plaintiffs' and Class Members' browsing activity and data has economic value; indeed, Google itself pays for this data as do other third-party research panels.

206.    Plaintiffs and Class Members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

### EIGHTH CLAIM FOR RELIEF

#### Unjust Enrichment

207.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

208.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

209.    Meta has wrongfully and unlawfully trafficked in the Plaintiffs' and Class Members' personal information and other browsing data without their consent for substantial profits.

210.    Plaintiffs' and Class Members' personal information and data have conferred an economic benefit on Meta, in that Meta used its unauthorized connection with Android communication channels to

link Facebook and Instagram accounts with user web browsing activity, de-anonymizing the data and rendering it more valuable to advertisers.

211.    Meta conducted this activity without consent.

212.    Meta was aware of the benefit conferred by Plaintiffs and Class Members.

213.    Indeed, Meta deliberately exploited the Android communication channels to link browsing information to Facebook and Instagram profiles. Meta therefore acted in conscious disregard of the rights of Plaintiffs and Class Members and should be required to disgorge all profit obtained therefrom to deter Meta and others from committing the same unlawful actions again.

214.    Meta has been unjustly enriched at the expense of Plaintiffs and Class Members, and has unjustly retained the benefits of its unlawful and wrongful conduct.

215.    It would be inequitable and unjust for Meta to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

216.    When a defendant is unjustly enriched at the expense of a plaintiff, the plaintiff may recover the amount of the defendant's unjust enrichment even if plaintiff suffered no corresponding loss, and the plaintiff is entitled to recovery upon a showing of merely a violation of legally protected rights that enriched a defendant.

217.    Meta has been unjustly enriched by virtue of its violations of Plaintiffs' and Class Members' legally protected rights to privacy as alleged herein, entitling Plaintiffs and Class Members to restitution of Defendant's enrichment. "[T]he consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." Restatement (Third) of Restitution § 1, cmt. a.

218.    Plaintiffs and Class Members accordingly are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that Meta obtained as a result of its unlawful and wrongful conduct.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter an order:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as Class Counsel for the Classes;

B.    Declaring that Defendant's conduct, as set forth above, violates the laws cited herein;

C.    Awarding damages, including nominal, actual, statutory, and punitive damages where applicable, to Plaintiffs and the Classes in an amount to be determined at trial;

E.    Awarding Plaintiffs and the Classes their reasonable litigation expenses, costs, and attorneys' fees;

F.    Awarding Plaintiffs and the Classes pre- and post-judgment interest, to the extent allowable;

G.    Awarding such other further equitable and declaratory relief as is necessary to protect the interests of Plaintiffs and the Classes; and

H.    Awarding such other and further relief as the Court deems reasonable and just.

## IX.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: June 25, 2025                    Respectfully submitted,

/s/ *Jennifer L. Joost*
Jennifer L. Joost (Bar. No. 296164)
jjoost@ktmc.com
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

Joseph H. Meltzer (*pro hac vice* forthcoming)
jmeltzer@ktmc.com
Melissa L. Yeates (*pro hac vice* forthcoming)

myeates@ktmc.com
Tyler S. Graden (*pro hac vice* forthcoming)
tgraden@ktmc.com
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

James E. Cecchi (*pro hac vice* forthcoming)
jcecchi@carellabyrne.com
Kevin G. Cooper (*pro hac vice* forthcoming)
kcooper@carellabyrne.com
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973)-994-1700
Facsimile: (973)-994-1744

***Counsel for Plaintiffs and the Proposed Class***